**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **DAVID COLE**, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v.  ) | Civil Action No. 19-cv-1182 (TSC) |
| ) | |
| **DR. WALTER G. COPAN, in his official** ) | |
| **capacity as Director of the National** ) | |
| **Institute for Standards and Technology,** ) | |
| **AND THE NATIONAL INSTITUTE OF** ) | |
| **STANDARDS AND TECHNOLOGY**, ) | |
| ) | |
| Defendants. ) | |
| ) | |

## MEMORANDUM OPINION

Plaintiff David Cole brought this action against Defendants the National Institute of

Standards and Technology, an agency of the United States Department of Commerce, and its

Director, Dr. Walter Copan, (collectively "NIST") under the Freedom of Information Act

("FOIA").  5 U.S.C. § 552.  Cole seeks to compel disclosure of input data and original analyses

conducted by NIST regarding the role played by the seated connection at Column 79[1] of 7 World

Trade Center ("WTC 7") in the collapse of WTC 7 on September 11, 2001.  WTC 7 was one of

seven buildings comprising the original World Trade Center complex.  Defendants have moved

for summary judgment, (ECF No. 10), and Plaintiff cross-moved for summary judgment or, in

---

[1]  A "seated connection" is a structural element typically used in large commercial buildings in which a horizontal steel beam is connected to a vertical steel column via a protruding "seat" on which the horizontal beam rests in order to provide greater stability.  *See generally Types of Steel Beam Connections and Their Details*, THE CONSTRUCTOR, https://theconstructor.org/structural-engg/types-steel-beam-connections/19010/ (last visited November 12, 2020).

the alternative, for discovery under Rule 56(d).  (ECF No. 12.)  For the reasons set forth below, the court will GRANT Defendants' motion and DENY Plaintiff's motion.

## I.    BACKGROUND

On September 11, 2001, in a coordinated terrorist attack, two large commercial airplanes flew into the North and South towers of the World Trade Center in New York City.  The collapse of the North tower caused structural damage to WTC 7, which collapsed seven hours later.  (ECF No. 14-1, Pl. SOF ¶¶ 1–2.)[2]

In 2002, Congress enacted the National Construction Safety Team Act ("NCSTA"), 15 U.S.C. § 7301 *et seq*., authorizing NIST to establish National Construction Safety Teams to investigate "the failure of a building or buildings that has resulted in substantial loss of life or that posed significant potential for substantial loss of life."  15 U.S.C. § 7301(a).  Pursuant to this authority, NIST investigated the collapse of WTC 7, a forty-seven-story office building located immediately to the north of the buildings surrounding World Trade Center Plaza.  (Pl. SOF ¶¶ 4–6.)  NIST subsequently published two reports summarizing the results of its investigation—the first in 2005 and the second in 2008 (collectively the "NCSTAR Report").  (*Id*.)  In January 2009, NIST released an errata sheet reflecting changes made to the text of the NCSTAR Report, which was subsequently updated in April and June of 2012.  (*Id*. ¶¶ 8–10.)  The errata sheet includes two corrections to the stated "dimensions and lateral displacements" of WTC 7 column 79.  (*Id*.)

On July 8, 2012, Cole, a "researcher and concerned citizen," (ECF No. 1, Compl. ¶ 4), submitted a FOIA request asking the agency to "[p]lease reference" the errata sheet to the

---

[2]  The parties have submitted statements of facts and agree regarding the events of September 11, 2001, that are relevant to the discussion herein.  (*See* Pl. SOF; ECF No. 10-1, Defs. SOF.)

NCSTAR Report and seeking "the input data and the original analyses for the seated connection at column 79 referenced [therein]"; on July 12, 2012 he revised his request. (ECF No. 10-3, Ex. 1, FOIA Request; *see also* Pl. SOF ¶¶ 13–15.)

In response, NIST searched records systems containing information related to the WTC 7 collapse investigation. The search was performed by the Deputy Director of the Building and Fire Research Laboratory and overseen by Catherine Fletcher, NIST's FOIA/Privacy Act Officer. (Pl. SOF ¶¶ 22–26; *see also* ECF No. 10-3, Ex. 7, FOIA Checklist.) On August 16, 2012, NIST informed Cole that it had identified 35,394 responsive files. (ECF No. 10-3, Ex. 2, FOIA Final Response.) However, the agency noted that the files contained information received in the course of its investigation, disclosure of which would jeopardize public safety, and that information was therefore exempt from disclosure pursuant to FOIA Exemption 3, which protects records that are "specifically exempted from disclosure by statute," 5 U.S.C. § 552(b)(3), in this case Section 7(d) of the NCSTA. 15 U.S.C. § 7306(d). NIST withheld the files in their entirety, claiming that any non-exempt responsive records could not be segregated from records covered by the exemption. (FOIA Final Response; *see also* Pl. SOF ¶¶ 16–17, 29; ECF No. 10-3, Fletcher Decl. ¶ 14.)

Cole appealed the determination. (ECF No. 10-3, Ex. 3, FOIA Appeal.) In its response letter, the Department of Commerce denied Cole's appeal and reiterated that the documents and information he sought were not segregable and were covered in full by FOIA Exemption 3 and NCSTA Section 7(d). (ECF No. 10-3, Ex. 4, FOIA Appeal Final Response.)

## II.   LEGAL STANDARD

### A.  <u>Summary Judgment</u>

Summary judgment is appropriate where the record shows no genuine issue of material fact, and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Waterhouse v. District of Columbia*, 298 F.3d 989, 991 (D.C. Cir. 2002).  Courts must view "the evidence in the light most favorable to the non-movant[ ] and draw[ ] all reasonable inferences accordingly," and must determine whether a "reasonable jury could reach a verdict" in the non-movant's favor.  *Lopez v. Council on Am.-Islamic Rel. Action Network, Inc.*, 826 F.3d 492, 496 (D.C. Cir. 2016).  FOIA cases are "typically and appropriately decided on motions for summary judgment."  *Moore v. Bush*, 601 F. Supp. 2d 6, 12 (D.D.C. 2009).

### B.  <u>FOIA</u>

FOIA provides a "statutory right of public access to documents and records" held by federal agencies.  *Citizens for Resp. & Ethics in Wash. (CREW) v. U.S. Dep't of Just.*, 602 F. Supp. 2d 121, 123 (D.D.C. 2009) (quoting *Pratt v. Webster*, 673 F.2d 408, 413 (D.C. Cir. 1982)).  FOIA requires that federal agencies comply with requests to make their records available to the public, unless such "information is exempted under [one of nine] clearly delineated statutory [exemptions]."  *CREW*, 602 F. Supp. 2d at 123 (internal quotation marks omitted); *see also* 5 U.S.C. § 552(a)–(b).

In cases challenging the applicability of certain FOIA exemptions, the district court conducts a *de novo review* of the agency's decision to withhold requested documents.  *See Moore v. Aspin*, 916 F. Supp. 32, 35 (D.D.C. 1996); 5 U.S.C. § 552(a)(4)(B).  The burden is on the agency to show that nondisclosed, requested material falls within a stated exemption, *see*

*Petroleum Info. Corp. v. U.S. Dep't of Interior*, 976 F.2d 1429, 1433 (D.C. Cir. 1992) (citing 5 U.S.C. § 552(a)(4)(B)), and its "justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" *Ayuda, Inc. v. FTC*, 70 F. Supp. 3d 247, 261 (D.D.C. 2014) (quoting *Wolf v. CIA*, 473 F.3d 370, 374–75 (D.C. Cir. 2007)).  Agencies may rely on supporting declarations that are reasonably detailed and non-conclusory.  *See King v. U.S. Dep't of Just.*, 830 F.2d 210, 218 (D.C. Cir. 1987).  "If an agency's affidavit describes the justifications for withholding the information with specific detail, demonstrates that the information withheld logically falls within the claimed exemption, and is not contradicted by contrary evidence in the record or by evidence of the agency's bad faith, then summary judgment is warranted on the basis of the affidavit alone." *ACLU v. U.S. Dep't of Def.*, 628 F.3d 612, 619 (D.C. Cir. 2011) (citations omitted).

In cases where the adequacy of a search is at issue, the court employs a reasonableness test to evaluate the agency's search for responsive materials.  *Rodriguez v. Dep't of Def.*, 236 F. Supp. 3d 26, 34 (D.D.C. 2017) (citing *Campbell v. U.S. Dep't of Just.*, 164 F.3d 20, 27 (D.C. Cir. 1998)).  "[T]he adequacy of a FOIA search is generally determined not by the fruits of the search, but by the appropriateness of the methods used to carry out the search."  *Iturralde v. Comptroller of the Currency*, 315 F.3d 311, 315 (D.C. Cir. 2003).  "An agency may establish the adequacy of its search by submitting reasonably detailed, nonconclusory affidavits [or declarations] describing its efforts."  *Baker & Hostetler LLP v. U.S. Dep't of Commerce*, 473 F.3d 312, 318 (D.C. Cir. 2006).  The court must accord agency affidavits "a presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents."  *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (internal quotation marks and citation omitted).

C. **Discovery**

When a plaintiff seeks discovery under Federal Rule of Civil Procedure 56(d) in response to a defendant's motion for summary judgment, a court may deny or defer summary judgment if "a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition." Fed. R. Civ. Pro. 56(d).  To be entitled to discovery, the nonmovant must: (1) "outline the particular facts [the non-movant] intends to discover and describe why those facts are necessary to the litigation," (2) "explain 'why [the non-movant] could not produce the facts in opposition to the motion for summary judgment,'" and (3) "show the information is in fact discoverable." *United States ex rel. Folliard v. Gov't Acquisitions, Inc.*, 764 F.3d 19, 26 (D.C. Cir. 2014) (quoting *Convertino v. U.S. Dep't of Just.*, 684 F.3d 93, 99–100 (D.C. Cir. 2012)) (alterations in original).  In FOIA cases, discovery "is rare and should be denied where an agency's declarations are reasonably detailed, submitted in good faith and the court is satisfied that no factual dispute remains." *Baker & Hostetler LLP*, 473 F.3d at 318 (quoting *Schrecker v. U.S. Dep't of Just.*, 217 F. Supp. 2d 29, 35 (D.D.C. 2002)).

### III.    ANALYSIS

A. **NIST's Interpretation of Cole's Request was Reasonable and the Ensuing Search was Reasonably Calculated to Discover all Relevant Documents**

1. **NIST's Interpretation of "Input Data" was Reasonable**

Under FOIA, the "burden of adequately identifying the record requested" lies with the requester, *Larson v. Dep't of State*, 565 F.3d 857, 869 (D.C. Cir. 2009) (citation omitted); a request "must reasonably describe the records sought," although "an agency also has a duty to construe a FOIA request liberally." *Nation Mag. v. U.S. Customs Serv.,* 71 F.3d 885, 890 (D.C. Cir. 1995) (citing 5 U.S.C. § 552(a)(3)) (quotation marks omitted).

Agencies read and interpret FOIA requests as drafted, not as the requester "might wish it was drafted." *Miller v. Casey,* 730 F.2d 773, 777 (D.C. Cir. 1984).  It is the "requester's responsibility to frame requests with sufficient particularity." *Assassination Archives & Rsch. Ctr., Inc. v. CIA*, 720 F. Supp. 217, 219 (D.D.C. 1989), *aff'd*, No. 89-5414, 1990 WL 123924 (D.C. Cir. Aug. 13, 1990).  An agency may decide "to limit the scope of an ambiguous request as long as the narrowed scope is a reasonable interpretation of what the request seeks." *Wilson v. U.S. Dep't of Transp.*, 730 F. Supp. 2d 140, 154 (D.D.C. 2010), *aff'd*, No. 10–5295, 2010 WL 5479580 (D.C. Cir. Dec. 30, 2010).

Here, Cole's amended FOIA request sought "the input data and the original analyses for the seated connection at column 79." (FOIA Request.)  Cole sought this information in the context of two statements made in the errata sheet to the NCSTAR report, each of which provided corrections to typographical errors in Chapter 11 of that report.  (*Id.*)  Chapter 11, in turn, specifically discussed the computer simulations NIST conducted as part of its investigation into the collapse of WTC 7.

Cole argues that NIST should have read "input data" to mean "information that existed independent of the computer and the modelling and was data taken from paper or other electronic records containing it prior to the modelling being conducted."  (ECF No. 14, Pl. Br. at 18.)  NIST, on the other hand, understood "input data" to refer to "the data that was input into the computer models" to drive the models' analysis.  (ECF No. 17, Defs. Reply at 3, 4 n.5 (collecting dictionary definitions of "input data") (citations omitted).)  In light of Cole's request for information related to the published report on the WTC 7 computer models, NIST's computer programming experts declared that "it would not be reasonable to interpret 'input data' as including anything other than the data input into the computer models, nor would it be

7

reasonable to interpret 'original analyses' as including anything other than the results files"
produced by those models. (*Id.* at 3; *see also* ECF No. 17-1, 2d Fletcher Decl. ¶¶ 6–9.)

Cole failed to frame his FOIA request with "sufficient particularity" to reasonably
suggest that he wanted something other than the data that was input into the computer models.
*See Assassination Archives*, 720 F. Supp. at 219; *see also* 5 U.S.C. § 552(a)(3)(A) (requiring that
FOIA requests "reasonably describe" the records sought); *Larson*, 565 F.3d at 869 (upholding a
district court's narrow interpretation of a FOIA request where the request did not "reasonably
suggest" the broad scope argued by the plaintiff). Cole's initial FOIA request sought "the input
data and original analyses" referenced in the NCSTAR report and errata sheet. (FOIA Request.)
In his FOIA appeal, he distinguished "*measurements*" and other "information NIST *interpreted* .
. . from the drawings," which he sought, from the drawings themselves, which he acknowledged
were "received" by NIST and were thus subject to the Exemption statute. (FOIA Appeal
(emphasis in original).) Now, Cole argues that the "[t]he language used . . . in his administrative
appeal should have eliminated any ambiguity regarding whether his request for input data related
to records in paper form (such as drawings)" because he "stated, *inter alia*, that Defendants had
'*drawings*' that '*contained measurements.*'" (ECF No. 19, Pl. Reply at 9–10; *cf.* Pl. Br. at 18.)
But even if his administrative appeal put the government on notice that Cole sought
measurements NIST derived from paper documents such as the drawings, it did not indicate that
he also sought the drawings. Cole's attempts to reframe his request and appeal at this stage are
unavailing, and the court finds that NIST's interpretation of the scope of Cole's FOIA request
was reasonable. If Cole seeks information other than the data that was fed directly into NIST's
models, he may submit a new FOIA request identifying those records with the requisite
particularity.

2.  NIST's Search was Reasonably Calculated to Discover the Requested Documents

An agency responding to a FOIA request must make "a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." *Baker & Hostetler LLP*, 473 F.3d at 318 (quoting *Nation Mag.*, 71 F.3d at 890). "When a plaintiff questions the adequacy of the search . . . , the factual question it raises is whether the search was reasonably calculated to discover the requested documents, not whether it actually uncovered every document extant." *SafeCard Servs., Inc.*, 926 F.2d at 1201. Moreover, an agency need not search every record system for its search to be considered reasonable; a search is reasonable if it includes all systems "that are likely to turn up the information requested." *Oglesby v. U.S. Dep't of the Army*, 920 F.2d 57, 68 (D.C. Cir. 1990).

Cole argues that NIST's search was inadequate because NIST "failed to assert or explain whether requested records in paper format or in various electronic formats such as pdf, spreadsheet, word-processing, or image files exist, or whether a search was even conducted for such records." (Pl. Br. at 17.)  In response, NIST explains that this "argument flows from Plaintiff's erroneous interpretation of the term 'input data'" and that, given the agency's interpretation of "input data" as meaning "the information that was entered into the modeling program," its ensuing search for this data in the Engineering Laboratory files was reasonable. (Defs. Reply at 4–5.)

Fletcher, NIST's FOIA/Privacy Act Officer, supervised the search for records responsive to Cole's request.  Based on her experience responding to prior requests for similar information, Fletcher knew that responsive records would be located in the NIST Engineering Laboratory. (Fletcher Decl. ¶ 19; *see also* ECF No. 10-2, Defs. Br. at 4–5.)  She also knew that "locating responsive documents required significant technical expertise by someone knowledgeable both

in computer modelling and NIST's technical investigation" and that, due to the large number of files involved in the modelling process, "determining precisely which files were responsive to Plaintiff's request required a subject matter expert."  (Fletcher Decl. ¶ 20.)  Accordingly, Fletcher designated then-Deputy Director of NIST's Building Fire and Research Laboratory, Dr. William Grosshandler, to search the Engineering Laboratory's computers and computer disks.  (Fletcher Decl. ¶¶ 17–21; *see also* Defs. Br. at 5.)  Dr. Grosshandler's search identified "35,394 files containing embedded information relating to the seated connection at column 79," which were spread throughout "six of 10 sets of computer modelling programs" used in the WTC 7 investigation.  (Defs. Br. at 5; *see also* Fletcher Decl. ¶ 21; FOIA Checklist.)  Based on this declaration, NIST has demonstrated that it made "a good faith effort to conduct a search for the requested records," and that its methods were "reasonably calculated" to discover records containing the input data and analyses Cole requested.  *See Baker & Hostetler LLP*, 473 F.3d at 318 (internal citation and quotation marks omitted).

    "Once an agency has made a prima facie showing of adequacy, the burden shifts to the plaintiff to provide countervailing evidence . . . sufficient to raise substantial doubt concerning the adequacy of the agency's search."  *Rodriguez*, 236 F. Supp. 3d at 35 (internal citation omitted).  Cole's unsupported assertion that NIST should have interpreted his request for "input data" more broadly does not meet that burden.  The court finds that NIST's search was reasonable and in accordance with its obligations under FOIA.

**B.  NIST's Reliance on Exemption 3 was Proper**

    1.  The Requested Materials were Appropriately Withheld Under Exemption 3

NIST withheld the 35,394 files it identified as responsive to Cole's FOIA request pursuant to FOIA Exemption 3 and Section 7(d) of the NCSTA.  (Defs. Br. at 5.)  Under FOIA

Exemption 3, material is protected from disclosure where it is "specifically exempted from disclosure by statute," so long as the underlying statute "establishes particular criteria for withholding or refers to particular types of matters to be withheld."  5 U.S.C. § 552(b)(3)(A)(ii). Here, NCSTA Section 7(d) prohibits NIST from disclosing "any information it receives in the course of an investigation under this chapter if the [NIST] Director finds that the disclosure of that information might jeopardize public safety."  15 U.S.C. § 7306(d).

Prior to Cole's FOIA request, then-Director of NIST, Dr. Pat Gallagher, determined that the disclosure of information "received by the National Institute of Standards and Technology [], in connection with its investigation of the technical causes of the collapse of the World Trade Center Towers and World Trade Center Building 7 on September 11, 2001, might jeopardize public safety."  (ECF No. 10-3, Ex. 6, Dir. Findings.)  The Director extended his finding to include "[a]ll input and result files" of each computer model used by NIST to study the structural response and collapse propagation phase of WTC 7, as well as "all Excel spreadsheets and other supporting calculations used to develop floor connection failure modes and capacities."  (*Id.*)[3]

Cole argues that the Director's finding applies only to the modeling data as a whole and not to the "release of just the input data describing the component parts of the WTC7 Column 79 connection and the dimensions of same, standing alone."  (Pl. Br. at 28.)  He contends that the "input data" he seeks "simply contain[s] measurements of the various beams, columns, side plates, stiffeners, girders, and any other components" of the now destroyed WTC 7 building and

_____

[3]  Due to the elapsed time between the issuance of the Director's finding and Cole's FOIA request, Fletcher confirmed that the NIST Director "still considered that the disclosure of such files enumerated in the July 9, 2009 Finding would still potentially jeopardize public safety" while she supervised the review of Cole's request.  (Fletcher Decl. ¶ 27.)

that it does not relate to "how and why certain WTC7 structural components came to fail."  (*Id.* at 28–29.)

Cole's contention is contradicted by the Director's finding and the explanations in the supporting declarations.  As the court in a similar case, *Quick v. U.S. Department of Commerce, National Institute of Standards and Technology* found, "the Director of NIST brought his expertise to bear on the subject" and found that public disclosure of information pertaining to the simulated collapse of WTC 7 "'might jeopardize public safety' and should be withheld."  775 F. Supp. 2d 174, 180–81 (D.D.C. 2011) (quoting 15 U.S.C. § 7306(d)).  In her declaration, Fletcher explains that because of the highly technical nature of the documents in question, Dr. Grosshandler decided whether the Director's finding applied to the responsive records.  He ultimately determined that all the files were covered and that disclosing them could jeopardize public safety.  (Fletcher Decl. ¶ 25.)  Fletcher explained that the specific detailed models of WTC 7 are beyond the current state of public knowledge and therefore "if the files were disclosed, it would publicly disseminate tools that could be used to predict the collapse of a building which would provide technical instruction on how to most effectively devise schemes to destroy large buildings."  (*Id.* ¶ 26.)

NIST's declarations describe "the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith."  *Mil. Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981).  NIST has, in short, provided an adequate explanation of its invocation of the exemption.  The court need not "conduct a more detailed inquiry to test the agency's judgment and expertise or to evaluate whether the court agrees with the agency's opinions."  *Larson*, 565 F.3d at 865.

Cole further maintains that the Director's findings were incorrectly applied to his request for NIST's "original analyses" because the "computer modelling files were *created* by NIST, they are not information *received* by NIST . . . from others during an investigation under the statute." (Pl. Br. at 30–31 (emphasis in original).)  This distinction does not alter the court's analysis.  First, NIST attests that the input and results files were "received" by NIST: "The modeling analysis was created largely by individuals at two research and engineering firms," and "upon completion of their work, the source code was received by NIST." (Defs. Reply at 8 n.9 (citing 2d Fletcher Decl. ¶¶ 16–17.).)  Moreover, as the Department of Commerce stated in its response to Cole's FOIA appeal, to the extent that some of the material Cole seeks was "interpreted" rather than "received" by NIST, such information "is not segregable as it relates to the seated connection at column 79, and it is not possible to separate that which NIST created from the information it received" that was then integrated into the interpretive process. (FOIA Appeal Final Response at 2.)  As discussed further below, NIST's declarations "show with 'reasonable specificity' why the documents cannot be further segregated." *Armstrong v. Exec. Off. of the President*, 97 F.3d 575, 578 (D.C. Cir. 1996).  Cole has not provided sufficient evidence to counter NIST's testimony. *See infra* Section B.3.  Because the records were either themselves received from outside the agency or cannot be reasonably segregated from those that were, all the requested records are thus appropriately protected from disclosure by Exemption 3 and NCSTA Section 7(d).

>    2.   NIST Appropriately Relied Upon Fletcher's Affidavits

Cole objects to portions of Fletcher's declarations discussing the segregability of input data from results files and the danger posed to public safety by releasing the requested records. (Pl. Br. at 32–34.)  Cole claims that Fletcher "offers no fact basis in her declarations" and that

she likewise does not "establish any basis in her education, training, or experience to offer an expert opinion." (*Id.* at 33.) Under Federal Rule of Civil Procedure 56(e), however, a declarant in a FOIA case satisfies the personal knowledge requirement "if in his declaration, [he] attests to his personal knowledge of the procedures used in handling [a FOIA] request and his familiarity with the documents in question." *Barnard v. Dep't of Homeland Sec.* ("*Barnard I*"), 531 F. Supp. 2d 131, 138 (D.D.C. 2008) (internal citations and quotation marks omitted) (alterations in original). To meet these requirements, "FOIA declarants may include statements in their declarations based on information they have obtained in the course of their official duties." *White Coat Waste Project v. U.S. Dep't of Veterans Affs.*, 443 F. Supp. 3d 176, 193 (D.D.C. 2020) (quoting *Barnard v. Dep't of Homeland Sec.* ("*Barnard II*"), 598 F. Supp. 2d 1, 19 (D.D.C. 2009)). Therefore, a declaration may be sufficient if it is from the employee "in charge of coordinating the [agency's] search and recovery efforts" because he or she "is the most appropriate person to provide a comprehensive affidavit." *SafeCard Servs. Inc.*, 926 F.2d at 1201.

Applying this principle, the court finds that Fletcher's declarations properly supported NIST's motion for summary judgment. Fletcher did not offer an expert opinion, as Cole alleges, but rather attested "to [her] personal knowledge of the procedures used in handling" the request, *Barnard I*, 531 F. Supp. 2d at 138 (citations omitted), and any second-hand statements included in her declarations were based on information "obtained in the course of [her] official duties." *White Coat Waste Project*, 443 F. Supp. 3d at 193 (quoting *Barnard II*, 598 F. Supp. 2d at 19).

### 3.   NIST's Finding That the Documents Could Not be Segregated was Proper

Cole argues that some of the information he seeks should be released through segregation of the data from the computer model. Although "[a]ny reasonably segregable portion of a record

shall be provided to any person requesting such record" under FOIA, 5 U.S.C. § 552(b),

"[a]gencies are entitled to a presumption that they complied with the obligation to disclose

reasonably segregable material," *Sussman v. U.S. Marshals Serv.,* 494 F.3d 1106, 1117 (D.C.

Cir. 2007), so long as "government affidavits . . . show with 'reasonable specificity' why the

documents cannot be further segregated." *Armstrong*, 97 F.3d at 578; *see also Johnson v. Exec.*

*Off. for U.S. Att'ys*, 310 F.3d 771, 776 (D.C. Cir. 2002) ("The combination of the Vaughn index

and the affidavits . . . are sufficient to fulfill the agency's obligation to show with 'reasonable

specificity' why a document cannot be further segregated."). Although the precise "quantum of

evidence required to overcome that presumption is not clear," *Sussman,* 494 F.3d at 1117

(comparing cases), at minimum, a FOIA requester must "produce evidence that would warrant a

belief by a reasonable person that the alleged Government impropriety might have occurred."

*Nat'l Archives & Recs. Admin. v. Favish,* 541 U.S. 157, 174 (2004).

Cole contends that "any specific portion of the computer code files containing input data

that can be [] viewed can also be produced via a 'screen shot' . . . without releasing any truly

exempt computer modelling code." (Pl. Br. at 30, 38–39.) In her second declaration, Fletcher

affirmed that, under NCSTA Section 7(d) and per the Director's finding, "all of [the input and

results files] were entirely exempt in full," and thus there was no non-exempt information to

segregate. (2d Fletcher Decl. ¶¶ 14–15.) To the extent that any non-exempt information did

exist, however, the Department of Commerce noted in its response to Cole's FOIA Appeal that

"there were no separate, segregable analyses conducted in relation to the seated connection at

column 79." (FOIA Appeal Final Response at 2.) In order to make the corrections to the

NCSTAR report to which Cole's FOIA request referred, a NIST Research Structural Engineer

would have "to go through the coding and search it to find the dimensions," and even then the

information is embedded within "the input data and original analyses conducted in relation to the overall building collapse." (*Id.*)

The court finds the government's argument persuasive. "For the government to produce the requested screenshots, it would have to open the software and create a screenshot, which would not otherwise exist . . . ." *Colgan v. Dep't of Just.*, No. 14-cv-740, 2020 WL 2043828, *10 (D.D.C. 2020). "FOIA neither requires agencies to create new records nor to disclose records for which they do not 'retain possession or control.'" *Id.* (quoting *Kissinger v. Reps. Comm.*, 445 U.S. 136, 151–52 (1980)). As elaborated above, the computer modelling data used in NIST's investigation of the WTC 7 collapse was exempt under the NCSTA Section (d) and FOIA Exemption 3; despite Cole's argument to the contrary, the agency was under no obligation to create entirely new records in order to remove some data from this exemption.

## C.  Cole has not established that he is entitled to Discovery

As noted above, in order to be entitled to discovery under Federal Rule of Civil Procedure 56(d), a nonmoving party must show "by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition." Fed. R. Civ. P. 56(d). The party's affidavit must outline the particular facts the party intends to discover, explain why those facts could not be produced without additional discovery, and "show the information is in fact discoverable." *Folliard*, 764 F.3d at 26 (quoting *Convertino*, 684 F.3d at 99) (alterations in original).

It is well established in this Circuit that "in the FOIA context, courts have permitted discovery only in exceptional circumstances where a plaintiff raises a sufficient question as to the agency's good faith in searching for or processing documents." *Cole v. Rochford*, 285 F. Supp. 3d 73, 76 (D.D.C. 2018) (denying Plaintiff's motion for discovery). Where a party has

"offered no evidence of bad faith to justify additional discovery," the motion may be properly denied. *See Baker & Hostetler LLP*, 473 F.3d at 318.

Here, Cole's request for limited discovery is based on his allegation that NIST's interpretation of "input data" and subsequent search of its digital records alone are evidence of the agency's bad faith. (Pl. Br. at 40–43.) Cole sets forth four grounds for finding bad faith: first, NIST's "administrative record documents" acknowledge that Cole "was requesting not just the computer modelling results files, but also records containing the input data regarding WTC7 Column 79's connection"; second, the NCSTAR Report acknowledges "that NIST used drawings and other sources for data input into its computer modelling of WTC7's collapse on 9/11"; third, "no WTC7 data input records in paper, pdf, word-processing, or image file formats have been produced nor even listed in the Defendants Vaughn Index"; and fourth, NIST did not "attempt to explain why no records in paper, pdf, word-processing, or image file formats containing WTC7 computer modelling input data were produced or were even the subject of an agency search." (*Id.* at 43–44.)

Cole's bad faith argument is, as NIST notes, entirely contingent on the court finding that NIST's interpretation of Cole's request—and the scope of the ensuing search—was not reasonable. (*See* Defs. Reply at 12–13.) But, as explained above, NIST's interpretation of "input data" was reasonable and its search was reasonably calculated to uncover responsive materials. Cole has not raised a "sufficient question as to the agency's good faith in searching for or processing documents." *Cole*, 285 F. Supp. 3d at 76. Instead, he has proffered "mere assertions" that responsive documents may exist in document formats NIST did not review. *Cf.*

*Voinche v. FBI*, 412 F. Supp. 2d 60, 72 (D.D.C. 2006).  Cole's Motion for Discovery will therefore be denied.[4]

## IV.    CONCLUSION

For the foregoing reasons, the court will GRANT Defendants' motion for summary judgment, and will DENY Plaintiff's cross-motion for summary judgment and motion for discovery.  A corresponding Order will follow shortly.


Date:  November 30, 2020


*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge

---

[4] Cole's brief appears to request the court to conduct an *in camera* review of the records he identifies as potentially responsive.  (Pl. Br. at 39, 47.)  In deciding whether to conduct an *in camera* review, the court considers the following factors: judicial economy, conclusory nature of the affidavits, bad faith on the part of the agency, disputes on the contents, whether the agency proposes the inspection, and strong public interest in disclosure.  *Allen v. CIA*, 636 F.2d 1287, 1298–99 (D.C. Cir. 1980), *overruled on other grounds by Founding Church of Scientology of D.C., Inc. v. Smith*, 721 F.2d 828 (D.C. Cir. 1983).  Here, the absence of any evidence of bad faith on the part of the agency, the large volume of documents and associated strain on judicial resources, and the properly invoked exemption lead this court to conclude that an *in camera* exam is neither necessary nor appropriate.  *See Juarez v. Dep't of Just.*, 518 F.3d 54, 60 (D.C. Cir. 2008) (applying *Allen* factors and finding that affidavits properly articulated strong reasons for the documents to fall under an Exemption).